# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7852 | **DATE** | 3/14/2001 |
| **CASE TITLE** | LEADERSHIP COUNCIL,etc.,et al vs. ROSSI REALTY,INC.,et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion for summary judgment is denied as to Count I but granted as to Count II [74-1]. The parties are to file their pretrial order on or before 3/30/01. Pretrial conference is set for 4/10/01 at 2:00p.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | | |
| | No notices required. | | | number of notices | | |
| | Notices mailed by judge's staff. | | | MAR 1 5 2001 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | 15 | | 87 |
| | Copy to judge/magistrate judge. | | | docketing deputy initials | | |
| TBK | courtroom deputy's initials | | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LEADERSHIP COUNCIL FOR )
METROPOLITAN OPEN COMMUNITIES, INC., )
and GREATER ASHBURN PLANNING )
ASSOCIATION, INC., )
)
      Plaintiffs, )
)
    v. )
)
ROSSI REALTY, INC., )
JOSEPH R. ROSSI AND JOSEPH S. ROSSI )
)
      Defendants. )

DOCKETED

MAR 1 5 2001

Judge Ronald A. Guzman

98 C 7852

## MEMORANDUM OPINION AND ORDER

Pending is Defendant's motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below this motion is denied as to Count I but granted as to Count II (#74-1).

## BACKGROUND FACTS

Plaintiffs, Leadership Council for Metropolitan Open Communities ("Leadership Council") and Greater Ashburn Planning Association, Inc. ("GAPA"), filed this action against Defendants Rossi Realty, Joseph R. Rossi ("Rossi Sr.") and Joseph S. Rossi ("Rossi Jr."), alleging that Defendants conduct constitutes unlawful racial steering (Count I) and religious (Count II) discrimination in violation the Civil Rights Act of 1866 (42 U.S.C. § 1982) and the Fair Housing Act/Title VIII of the Civil Rights Act of 1968 (42 USC §§ 3601, 3604a- 3604e.)

1



In 1995, GAPA formed as an umbrella organization, representing five community groups: the Scottsdale Homeowner's Association, the Wrightwood Improvement Association, the Parkview Civic Association, the Ashburn Civic Association, and the Ashburn Community Project. GAPA's mission is to promote the Greater Ashburn area and to encourage people to purchase homes in Greater Ashburn. Greater Ashburn encompasses a region of Chicago extending from 75th Street at its northern border to 87th Street to its South, and from Western Avenue at its eastern border to Cicero at its western boundary.

Since 1978, Defendant Rossi Realty has served southwest Chicago and nearby suburban communities. Rossi Realty has had an Equal Service Manual and policy for 15 years. The firm displays Equal Housing posters in its offices and places the Equal Housing logo in nearly all of its advertisements. As a condition of employment, each agent signs the policy manual. In addition, agents of Rossi Realty have attended the Southwest Suburban Board of Realtors Equal Housing classes. Rossi Realty has signed the Chicago Board of Realtor's Voluntary Affirmative Marketing Agreement. Rossi Sr. asserts that Equal Service Reports are prepared for each client and turned in monthly for review by management.

Between 1995 and 1997, members of GAPA received complaints from Ashburn residents, regarding the practices of several real estate agencies in the area. Specifically, the residents complained that Realtors were persuading them to move because African Americans were moving into the area. Due to a concern that real estate agents were engaging in 'panic peddling' and steering potential home buyers into either predominately white or predominately African-American areas on the basis of the potential home buyer's race, GAPA contacted Leadership Council. GAPA's Vice President Anthony Philbin requested that the Leadership Council investigate Rossi Realty. As GAPA's Vice President, Philbin believed that a majority of

realtors were selling homes only to African Americans. In response to GAPA's concerns, Leadership Council conducted matched pair test of Defendant, Rossi Realty.

The test involved sending an African American tester and a white tester to Rossi Realty. On September 16, 1977, Adam Kroshus, a white tester, and a Leadership Council volunteer met with defendant Joseph S. Rossi at the offices of Rossi Realty. Kroshus documented the meeting in a report on the same day. Kroshus explained to Rossi Jr. that he was interested in purchasing a home in the Ashburn area. Rossi Jr. asked Kroshus questions regarding the style and features that he desired. The parties agree that Kroshus sought homes with at least three bedrooms, at least two baths, and a garage in a price range up to $135,000. Defendants, however, contend that Kroshus made additional specific requests of brick construction and dining room, which further narrowed the results given to him.

Rossi Jr. provided Kroshus a computer printout of seven available homes matching his criteria. Together, Rossi Jr. and Kroshus further narrowed down the list to four homes for Kroshus to look at. Kroshus did not recall narrowing a list of over 100 homes on a computer screen down to seven. Next, Kroshus asked Rossi Jr. if it would be a good idea for him to look at the homes before scheduling an appointment to inspect them. Kroshus claims that Rossi Jr. responded that it would be a good idea to look at the homes before scheduling an appointment because "there may be dogs in the area or people may be throwing watermelon rinds in the bushes." Kroshus further claimed that Rossi Jr. also stated "that there may be people with different religious beliefs in the area and that's fine but it may not be what you want to be around." Kroshus stated that in his opinion Rossi may have wanted to sell him a house in Ashburn—specifically the four homes he was given from the MLS listing.

Although Rossi Jr. could not specifically remember meeting with Kroshus, he did recall meeting with someone on September 15, 1997, who took interest in purchasing a home in the Ashburn area. Rossi Jr. does not dispute that he recommended looking at the homes before scheduling appointments. Rossi Jr. also acknowledges telling the individual that there may be people with different religious beliefs in the area and he may not be comfortable with that. Rossi Jr. claims that he makes this statement to every customer he has dealt with "so that they can make an informed choice on what they want to buy." However, Rossi Jr. denies making a comment regarding people throwing watermelon rinds in the bushes. Rossi Sr, stated that, in light of his knowledge of fair housing, if the statement were made he would consider it the wrong thing to say.

On September 17, 1997, Clifton Daniels, an African American tester, and a Leadership Council volunteer met with Rossi Sr. at the offices of Rossi Realty. Daniels drafted a report of his visit with Rossi Sr. the following day. Daniels explained to Rossi Sr. that he was interested in purchasing a home in the Ashburn area with a price range up to $135,000. Daniels testified that he specified the style and features he desired in a home, a three bedroom with a garage and two bathrooms. Rossi Sr.'s deposition testimony is inconsistent with his affidavit as to what Daniels actually desired in a home. In his affidavit, Rossi Sr. states that Daniels "did not wish to limit his inquiry, and merely requested a list of 3 bedroom, 2 bathroom homes available, with a two car garage, within his price range of $100,000 to $130,000." However, at his deposition, Rossi Sr. testified that Daniels requested only the Ashburn location, within a $100,000 to $130,000 price range, and that he requested no other features.

Rossi Sr. gave the notes that he made while speaking with Daniels to a woman in the office, who compiled a list of homes from a computer. Rossi Sr. gave Daniels the results—a list

of 105 homes—and told him, "well you have a lot of work to do." The list of 105 homes given

to Daniels contains residences with at least 3 bedrooms, within Daniels price range, all with

garages.  Rossi Sr. claims that Daniels expressed that he was in a hurry and simply wanted a list

of homes.  Daniels, however, did not remember telling Rossi Sr. that he was in a hurry, nor did

he document such a statement in his report.  Rossi Sr. told Daniels that many good homes were

available, and that Ashburn was a good area.  Rossi Sr. remarked, "we'll definitely find you

something." Within two hours of the close of his meeting with Rossi Sr., Daniels received a

voice message from an agent of Rossi Realty inquiring about Daniels preferences in the Ashburn

area.

In Count I, plaintiffs contend that defendants engaged in intentional and malicious racial

discrimination, in violation of both the Fair Housing Act (42 U.S.C. §§ 3601, 3604), and the

Civil Rights Act of 1968 (42 U.S.C. §§ 1981, 1982.).  In Count II, plaintiffs allege that the same

conduct amounts to intentional and malicious religious discrimination in violation of the Fair

Housing Act (42 U.S.C. §§ 3601).

# DISCUSSION

## I.  LEGAL STANDARD

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The determinant of whether a genuine issue of material fact exists is whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1996). Although the moving party carries the burden of showing there is no genuine issue of material fact, it may circumvent this requirement by "pointing" to the absence of evidence in support of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).  In ruling on a motion for summary judgement, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S. Ct. at 2513.  Nevertheless, the court's role does not involve making evaluations of credibility, nor does it weigh the evidence in search of preponderance, as would a jury. *See Futrell v. J.I Case*, 38 F.3d 342, 346 (7th Cir. 1994).

## II.  Racial Discrimination Under Fair Housing Act

The Fair Housing Act (Title VIII of the Civil Rights Act of 1968) proscribes making a dwelling unavailable to any person because of her race, discriminating on racial grounds against any person in the provision of services in connection with the sale of a dwelling, and falsely representing to any person because of her race the availability of a dwelling for sale. *See* 42 USC

§§ 3604 (a)(b)(d).[1]  Section 3604(d) established an enforceable right to truthful information

concerning the availability of housing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-79,

102 S. Ct. 1114, 1121-24, 71 L. Ed. 2d 214.  To make a prima facie showing for racial steering

under Title VIII a plaintiff must demonstrate that the real estate broker treated customers

differently because of their race. *See Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529-31

(7th Cir. 1990) (rehearing and rehearing en banc denied).[2]  "Disparate treatment . . . implies

consciousness of race, and a purpose to use race as a decision making tool." *Dwivedi*, 895 F.2d

at 1529-30.  Under Title VIII, a plaintiff need not show that the defendant intended to

discriminate in order to establish his claim, but must demonstrate defendant's conduct was likely

to have a discriminatory effect. *See id.* at 1529.

The use of testers has been a widely accepted mechanism for evaluating whether race is a

factor in the decision not to sell, rent or give truthful information. Where a white tester is given

substantially different information from that given an otherwise similar black tester, an inference

that race was a factor can be drawn. Defendants argue that plaintiffs' racial steering claim has not

been adequately supported by the facts offered in support of their claim that Defendants engaged

in racial steering.  Specifically, Defendants contend that Plaintiffs fail to demonstrate an essential

element of their prima facie case—the denial of a dwelling to a customer.  However, an absolute

refusal or denial to show a customer a dwelling is not required to find Title VIII violations: "[a]

---

[1] Plaintiffs Amended complaint cites 42 U.S.C. § 1981 and 42 U.S.C. § 1982 in addition to the Fair Housing Act. Yet, both parties address the racial steering allegations exclusively under the FHA.

[2] Generally, the elements of a prima facie case under the FHA require that the plaintiff show: (1) plaintiff is member of a minority; (2) that she applied for and was qualified to buy the property; (3) that she was rejected; and (4) that the property remained on the market. *SeePhillips v. Hunter Trails Community Ass'n.*, 685 F.2d 184, 190 (7th Cir. 1982).  We acknowledge that this framework does not lend itself to racial steering cases, where plaintiff basis its theory on the defendants' "directing prospective home buyers interested in equivalent properties to different areas according to their race." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 94, 99 S. Ct. 1601, 1605 (1979).

7

point-blank refusal is not necessary; any effort to discourage will do." *Dwivedi*, 895 F.2d at 1529. Furthermore, "any action by a real estate agent which in any way impedes, delays, or discourages on a racial basis a prospective home buyer from purchasing housing is unlawful" *Zuch v. Hussey*, 394 F.Supp. 1028, 1047 (E.D. Mich. 1975) (*aff. and remanded* 547 F.2d 1168 (6th Cir. 1977) unpublished table decision). Defendants have acknowledged that the testers were treated differently, but contend that any difference resulted from differences in customer preference and/or requests. Defendants argue that the different MLS results given to the testers resulted from the dissimilar requests made by the testers. According to Defendants arguments and testimony, although both testers sought homes with minimum of three bedrooms, at least two baths, and a garage in a price range up to $135,000, Kroshus (the white tester) made additional specific requests of brick construction and dining room, which further narrowed the results given to him. Plaintiffs point out that the only direct evidence in support of Defendants position that the testers made different requests is the deposition testimony of Rossi Sr. and his affidavit, which are in slight conflict.[3] Plaintiffs note that when a party's affidavit and deposition are in conflict courts will generally disregard the affidavit (especially when it is filed at the eleventh hour in support of a motion to dismiss.) *See Brill v. Lante Corp.*, 119 F.3d 1266, 1274 n.4 (7th Cir. 1997). In light of this discrepancy, Plaintiffs argue that we should discount or disregard Rossi Sr.'s affidavit. We find that this disparity in the evidence, which Defendants use to support their contentions, speaks to Defendants' intent and credibility further demonstrating disputed issues of fact.

---

[3] Although Rossi Sr. states in his affidavit that Daniels "did not wish to limit his inquiry, and merely requested a list of 3 bedroom, 2 bathroom homes available, with a two car garage, within his price range of $100,000 to $130,000," Rossi Sr. testified in his deposition that Daniels requested only the Ashburn area, within the $100,000 to $130,000 price range, and requested no other features. (Pls.' Exh. M at 83-84; Defs.' Exh. D at 4).

Although it is undisputed that the white tester received assistance in narrowing the list of homes down whereas the African American tester did not, Defendants claim that again the testers were not similarly situated because Daniels told Rossi Sr. that he was in a hurry and merely wanted a list of homes. Daniels, however, testified that he did not recall making the statement, and he did not indicate making the statement in his report. Defendants also note that it is undisputed that the African American tester received a telephone call from an agent at Rossi Realty within two hours of his visit, who wanted additional information regarding his preferences. Defendants baldly deny that Rossi Jr. made the racial remark to the white tester and further deny that Rossi's made the discriminatory comments or conduct in the presence of their former employees.

The Court is unpersuaded that this attempt to distinguish the two situations justifies summary judgment in favor of Defendants. We find this series of opposing contentions, each supported by favorable testimony, amounts to genuine issues of material fact as to whether the testers were similarly situated, and if so whether Defendants treated the testers differently on the basis of their race. Whether race was a factor in the failure of the Defendants to treat both testers similarly is a question of fact for the factfinder. While we make no judgment as to whether racial steering in the form of disparate treatment occurred, we cannot say as a matter of law that it did not. If a jury were to find Defendants' testimony more credible, they could conclude that Defendants were honestly trying to serve the individual preferences of the customers (testers). Conversely, a reasonable jury could conclude that the alleged statements and conduct did in fact occur and would have an untoward effect on a reasonable person under the circumstances who is seeking housing, *Heights Comm'ty Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985). In short, that defendants engaged in the conduct with the intent to steer, by "cajoling or

9

coercing the customer because of his race to . . . look in this community rather than that."

*Dwivedi*, 895 F.2d at 1530. The facts of the record reveal triable issues, and thus Defendants are

not entitled to summary judgment as to plaintiffs' Title VIII racial discrimination claim.

### III. Religious Discrimination

In Count II of its Amended Complaint, Plaintiffs claim that Defendants' engaged in

unlawful religious discrimination in violation the Civil Rights Act of 1866 (42 U.S.C. § 1982)

and the Fair Housing Act/Title VIII of the Civil Rights Act of 1968 (42 USC §§ 3601 et seq.). In

support of their claim, Plaintiffs point to the fact that Rossi Jr. made the comment to the white

tester that "there may be people with different religious beliefs in the area and that's fine but it

may not be what you want to be around." We find this comment innocuous in light of the fact

that Rossi Jr. claims that he makes the statement to every customer "so that they can make an

informed choice on what they want to buy." When a "broker treats all his customers the same . .

. he is not liable." *Dwivedi*, 895 F.2d at 1531. Furthermore, the statement itself is non-

judgemental and thus not likely made for the purpose of steering the customer. Plaintiffs offer no

arguments whatsoever in opposition to Defendants' statement nor do they in their brief set forth

any arguments why this statement is sufficient to survive summary judgement. In fact,

Plaintiff's response brief in opposition to summary judgment is completely devoid of any

argument as to Count II. Accordingly, Defendants motion for summary judgment is granted on

Plaintiffs Title VIII Religious Discrimination Claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied as to

Count I but granted as to Count II. (#74-1). The parties are to file their pretrial order on or before

March 30, 2001. Pretrial conference is set for April 10, 2001 at 2:00 p.m.

**SO ORDERED**

ENTERED: *3/19/01*

HON. RONALD A. GUZMAN
**United States Judge**

11